# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

| | | |
|---|---|---|
| WEST COAST PRODUCTIONS, INC., | : | |
| | : | |
| Plaintiff, | : | Civil Action Number |
| | : | |
| v. | : | |
| | : | 4:11-cv-00211-HLM |
| ROBIN POPHAM, | : | |
| | : | |
| Defendant. | : | Jury Trial Demanded |
| | : | |

## DEFENDANT'S FIRST REQUEST FOR ADMISSIONS

Pursuant to Fed. R. Civ. 36, Defendant hereby requests that Plaintiff respond to the following Requests for Admissions:

## INSTRUCTIONS

Respond to the following statements with either "admitted" or "denied" or a qualified statement, but only if a qualified statement is essential to providing an accurate response to an otherwise imperfect request for admission.  See generally Tequila Centinela, S.A. de C.V. v. Bacardi & Co. Ltd., 247, F.R.D. 198, 203 (D.D.C. 2008) (compound questions require a compound response).  However, do not qualify an answer based on the "information and belief" of Plaintiff.  See generally Interland, Inc. v. Bunting, 2005 WL 2414990 * 11 (N.D. Ga. 2005).  A

1

reasonable investigation must be conducted before responding.  See generally M & T Mortg. Corp. v. Miller, 2008 WL 4163141 (E.D. N.Y. 2008) (party's failure to inspect records in possession of third parties but to which the party had access resulted in requests being deemed admitted).  This duty includes but is not limited to consulting any documents or other information within Plaintiff's custody or control.  See generally Bouchard v. U.S., 241 F.R.D. 72, 76-77 (D. Me. 2007); Concerned Citizens of Belle Haven v. Belle Haven Club, 223 F.R.D. 39, 44 (D. Conn. 2004) (inquiry may, in limited circumstances, extend to non-parties).  The duty also includes inquiring of an expert.  See generally Drutis v. Rand McNally & Co., 236 F.R.D. 325, 331 (E.D. Ky. 2006).  If a lack of knowledge is claimed, specifically state such under oath and specify the steps taken in attempting to response.  See generally Rule 36(a) advisory committee's note (1970) & 37(c)(2), House v. Giant of Maryland LLC, 232 F.R.D. 257, 262 (E.D. Va. 2005), and Interland at *10.  If a request is supposedly "vague or ambiguous," it is advisable to confer with Defendant's counsel prior to responding.  See generally TK Power, Inc. v. Textron, Inc., 2006 WL 733494 * 6 (N.D. Cal. 2006).

## DEFINITIONS

1.     The term "Plaintiff" means West Coast Productions, Inc.

2.     The term "Knowledge" or "knowledge" means any actual knowledge that a person has, facts told to a person that have not been verified (regardless of whether hearsay), speculation, experiences, and any other information pertaining to a subject matter regardless of whether have been verified as true or not.

3.     Unless the context is otherwise, the terms "you" or "your" means Plaintiff, including any employee, independent contractor, agent, or other person acting by reason of, under the control of, or in association with Plaintiff.

4.     "Work" means the allegedly copyrighted work referred to in Plaintiff's Complaint in this action and the Prior Action.

5.     The term "document" is defined as broadly as the word has been interpreted under the Federal Rules of Civil Procedure and includes both digital and non-digital formats as well as the original, each non-identical copy (whether different from the original by means of notes made on such copy or otherwise), and – if the original is not in existence or subject to your control – each copy, regardless of origin or location, of any handwritten, typewritten, printed, computerized, electronically stored, recorded, transcribed, punched, taped, photocopied, photostatic, "telexed," filmed, microfilmed or otherwise prepared matter, however produced or reproduced,

3

which is in your possession, custody, or control, including but not limited to all electronically stored information, email messages, letters, correspondence, memoranda, telegrams, telexes, cables, memoranda or minutes of meetings or conversations (in person or telephonic), reports, notes, computer discs, tapes and files, legal documents, electronica data and writings of every description.

6.    The terms "identity," "identify," "identifying," describe," or "describing" mean: (i) as to any person or entity: the name, address(es), job title and dates so employed and, if not an individual, the type of entity; (ii) as to any document: the type of document (correspondence, memorandum, etc.), the identity of the author or originator, the date of authored or originated, the identity of each person to whom the original or copy was addressed or delivered, the identity of such person known or reasonably believed by you to have present possession, custody, or control thereof, and a brief description of the subject matter thereof, or, if the document has already been produced in this matter, its document identification number; (iii) as to information or knowledge in general: any information or Knowledge pertaining to the subject matter of the interrogatory, including but not limited to any facts known, experiences dealing with, actions performed in

regard thereto, the identity of persons consulted or from whom information

or advice was obtained in regard thereto (regardless of whether it is hearsay),

devices used, and events took place or that will take place; (iv) as to any

"Settlement;" the identity of the parties to the agreement, date the agreement

was signed by each party, and the amount of any monies paid by any party

including to whom monies were paid and when.

7.   The terms "pertain to" and "pertaining to" mean and include: refers to,

contains, concerns, describes, embodies, mentions, constitutes, supports,

corroborates, demonstrates, proves, evidences, shows, refutes, disputes,

rebuts, controverts or contradicts.

8.   The term "Settlement" means any contract or agreement pertaining to a

specific instance of copyright infringement of *Work* via the bittorrent

protocol, regardless whether it can be characterized as a "settlement," a

"promise not to sue" or any other type of contract or agreement.

9.   The term "person" means any individual, corporation, proprietorship,

partnership, trust, association or any other entity.

10.   The terms "third party" and "third parties" refers to individuals or entities

that are not a party to this action.

11.   The terms "action" or "this lawsuit" means the above-styled case.

12.   As used herein, (i) the singular of any word or phrase includes the plural and the plural of any word or phrase includes the singular, and (ii) "and" and "or" shall be construed either conjunctively or disjunctively to bring within the scope of these requests for production any information, documents or tangible things that might be otherwise be construed to be outside the scope of these requests for production.

13.   "Benjamin Perino" means the person with the same name who is referred to in the docket in the Prior Lawsuit, including any employee, independent contractor, agent, or other person acting by reason of, under the control of, Benjamin Perino.

14.   "Guardaley" means the company referred to in the docket in the Prior Lawsuit, including any employee, independent contractor, agent, or other person acting by reason of, under the control of, or in association with Guardaley.

15.   "Patrick Achache" means the same person referred to in the docket for the Prior Lawsuit, including any employee, independent contractor, agent, or other person acting by reason of, under the control of, or in association with Patrick Achache.

16.   Unless the context indicates otherwise, the term "ISP" means Comcast.

17.     "Prior Lawsuit" means the lawsuit filed in the United States District Court
for the District of Columbia with the civil action number of 1:11-cv-00057.

18.     "Morgan" means Elizabeth Morgan, current counsel for Plaintiff, her law
firm, including any employee, independent contractor, agent, or other person
acting by reason of, under the control of, or in association with Morgan.

19.     The term "DGW" means the law firm who handled the Prior Lawsuit,
including any employee, independent contractor, agent, or other person
acting by reason of, under the control of, or in association with DGW.

20.     The term "Wireless Security" means any subject matter area relating to
wireless security at that phrase is generally understood in the computer
science field, including but not limited to the following subject areas:
different types of encryption (e.g. WEP, WPA, WPA2), distance or range of
various wireless networks and/or wireless devices such as a router, the types,
operation, and characteristics of a "firewall" or any other software or
hardware designed to provide network security, impermissible use of one's
wireless Internet account (e.g. through "wardriving"), a "brute force" attack
to determine the password to a wireless network, "sniffing" and/or collection
of packets of information with the goal of determining a password, the
assignment of an IP address by an internet service provider to a customer,

the default settings on any router or other device used to facilitate wireless access to the Internet, etc.

21.    The term "Bittorrent Protocol" means the peer-to-peer file-sharing protocol originally designed by Bram Cohen and any additions, modifications, versions or other augmentations since its inception –for example, including but not limited to how "trackers" operate, "peer exchange," "DHT," the "HASH" value of a file as pertaining to the Bittorrent Protocol's "swarming" technique, "swarming," "clients" of the protocol and any differences in their default settings or capabilities in general, "choke algorithym," "magnetic" links, etc.

22.    The term "File" means the file that Plaintiff alleges that Defendant downloaded via the bittorrent protocol as set forth in Plaintiff's Complaint, including its HASH value, size, name, and file type (e.g. .mov versus .mpeg).

## <u>REQUESTS</u>

1.  The IP Address, if in fact assigned to Defendant's Internet account at the time of the infringement that is alleged in the Complaint, was a "dynamic" IP address as that term is understood in computer science terms.

2.  It is possible for someone to "spoof" an IP address as that term is used in the computer science field.

3.  It is possible to change a computer device's "MAC Address" as that term is understood in the computer science field.

4.  It is possible to change a router's "MAC Address" as that term is understood in the computer science field.

5.  The video located at

https://www.youtube.com/watch?feature=player_embedded&v=c6mgsMkDz3w is accurate insofar as it shows one way that a piece of hardware's MAC address can be changed.

6.  The video located at

https://www.youtube.com/watch?feature=player_embedded&v=c6mgsMkDz3w is relevant in this case.

7.  The video located at

https://www.youtube.com/watch?feature=player_embedded&v=c6mgsMkDz3w is admissible as evidence in this case.

8.  The video located at

https://www.youtube.com/watch?feature=player_embedded&v=c6mgsMkDz3w is authentic.

9.  The online news article located at

http://news.bbc.co.uk/2/hi/technology/2885339.stm is authentic.

10. The online news article located at

http://news.bbc.co.uk/2/hi/technology/2885339.stm is relevant in this case.

11. The online news article located at

http://news.bbc.co.uk/2/hi/technology/2885339.stm is admissible as evidence in

this case.

12. The online news article located at

http://news.bbc.co.uk/2/hi/technology/2885339.stm is accurate with respect to the

statements of fact contained therein.

13. The online article located at https://torrentfreak.com/bittorrents-

future-dht-pex-and-magnet-links-explained-091120/ is authentic.

14. The online article located at https://torrentfreak.com/bittorrents-

future-dht-pex-and-magnet-links-explained-091120/ is relevant in this case.

15. The online article located at https://torrentfreak.com/bittorrents-

future-dht-pex-and-magnet-links-explained-091120/ is admissible as evidence in

this case.

16. The online article located at https://torrentfreak.com/bittorrents-future-dht-pex-and-magnet-links-explained-091120/ is accurate in how it describes the computer science concepts discussed therein.

17. The website of http://www.phenoelit-us.org/dpl/dpl.html contains an accurate list of default passwords for computer devices as of 7/3/2007.

18. The website located at http://www.phenoelit-us.org/dpl/dpl.html is admissible as evidence in this case.

19. The website located at http://www.phenoelit-us.org/dpl/dpl.html is relevant in this case.

20. The article located at http://arstechnica.com/old/content/2005/07/5068.ars contains an accurate description of "wardriving" as that term is generally understood in the computer science field.

21. The article located at http://arstechnica.com/old/content/2005/07/5068.ars is relevant in this case.

22. The article located at http://arstechnica.com/old/content/2005/07/5068.ars is admissible as evidence in this case.

23. The article located at

http://arstechnica.com/old/content/2005/07/5068.ars is authentic.

24. The website of http://onguardonline.gov/topics/secure-your-computer

is relevant in this case.

25. The website of http://onguardonline.gov/topics/secure-your-computer

is authentic for purposes of this case.

26. The website of http://onguardonline.gov/topics/secure-your-computer

is admissible as evidence in this case.

27. The article (and video linked therein) located at

http://lifehacker.com/5873407/how-to-crack-a-wi+fi-networks-wpa-password-

with-reaver is authentic.

28. The article (and video linked therein) located at

http://lifehacker.com/5873407/how-to-crack-a-wi+fi-networks-wpa-password-

with-reaver is accurate in that it shows one possible way to crack WPA and WPA2

wireless encryption.

29. The article (and video linked therein) located at

http://lifehacker.com/5873407/how-to-crack-a-wi+fi-networks-wpa-password-

with-reaver is admissible as evidence in this case.

30. The article (and video linked therein) located at

http://lifehacker.com/5873407/how-to-crack-a-wi+fi-networks-wpa-password-with-reaver is relevant for purposes of this case.

31. The article located at

http://www.slate.com/articles/technology/webhead/2004/11/how_to_steal_wifi.single.html is admissible evidence in this case.

32. The article located at

http://www.slate.com/articles/technology/webhead/2004/11/how_to_steal_wifi.single.html is authentic.

33. The article located at

http://www.slate.com/articles/technology/webhead/2004/11/how_to_steal_wifi.single.html is relevant for purposes of this case.

34. The article located at

http://www.slate.com/articles/technology/webhead/2004/11/how_to_steal_wifi.single.html is accurate insofar as it describes how a person can access another

person's wireless Internet network without the owner's permission.

35. The article located at http://www.wsbtv.com/news/news/investigators-man-stole-ids-7-states-using-wi-fi/nLJgC/ is authentic.

36. The article located at http://www.wsbtv.com/news/news/investigators-man-stole-ids-7-states-using-wi-fi/nLJgC/ is accurate insofar that it gives one possible course of criminal conduct that it is possible for a person to do.

37. The article located at http://www.wsbtv.com/news/news/investigators-man-stole-ids-7-states-using-wi-fi/nLJgC/ is relevant to this case.

38. The article located at http://www.wsbtv.com/news/news/investigators-man-stole-ids-7-states-using-wi-fi/nLJgC/ is admissible as evidence in this case.

39. The article located at http://news.cnet.com/8301-1035_3-20030695-94.html is relevant to this case.

40. The article located at http://news.cnet.com/8301-1035_3-20030695-94.html is admissible as evidence in this case.

41. The article located at http://www.securityfocus.com/news/10138 is relevant to this case.

42. The article located at http://www.securityfocus.com/news/10138 is authentic.

43. The article located at http://www.securityfocus.com/news/10138 is admissible as evidence in this case.

44. The article located at http://www.newswireless.net/index.cfm/article/2317 is authentic.

45. The article located at

http://www.newswireless.net/index.cfm/article/2317 is relevant to this case.

46. The article located at

http://www.newswireless.net/index.cfm/article/2317 is admissible as evidence in

this case.

47. The article located at http://www.wsbtv.com/news/news/police-warn-

thieves-using-wi-fi-steal-identities/nFbDH/ is authentic.

48. The article located at http://www.wsbtv.com/news/news/police-warn-

thieves-using-wi-fi-steal-identities/nFbDH/ is relevant to this case.

49. The article located at http://www.wsbtv.com/news/news/police-warn-

thieves-using-wi-fi-steal-identities/nFbDH/ is admissible as evidence in this case.

50. The article (and embedded sound clip) located at

http://arstechnica.com/tech-policy/news/2011/04/settle-up-voicemails-show-p2p-

porn-law-firms-in-action.ars is authentic.

51. The article (and embedded sound clip) located at

http://arstechnica.com/tech-policy/news/2011/04/settle-up-voicemails-show-p2p-

porn-law-firms-in-action.ars is relevant to this case.

52. The article (and embedded sound clip) located at

http://arstechnica.com/tech-policy/news/2011/04/settle-up-voicemails-show-p2p-porn-law-firms-in-action.ars is admissible as evidence in this case.

53. The article located at https://torrentfreak.com/15-percent-of-us-file-sharers-hide-their-ip-address-111229/?utm_source=feedburner&utm_medium=feed&utm_campaign=Feed%3A+Torrentfreak+%28Torrentfreak%29 is relevant to this case.

54. The article located at https://torrentfreak.com/15-percent-of-us-file-sharers-hide-their-ip-address-111229/?utm_source=feedburner&utm_medium=feed&utm_campaign=Feed%3A+Torrentfreak+%28Torrentfreak%29 is admissible as evidence in this case.

55. The article located at https://torrentfreak.com/15-percent-of-us-file-sharers-hide-their-ip-address-111229/?utm_source=feedburner&utm_medium=feed&utm_campaign=Feed%3A+Torrentfreak+%28Torrentfreak%29 is accurate insofar as is shows that it is possible for a person to "hide" their IP address as that term is used in the article.

56. The website located at http://www.routerpasswords.com/ is relevant to this case.

57.The website located at http://www.routerpasswords.com/ is admissible as evidence in this case.

58.The website located at http://www.routerpasswords.com/ is authentic insofar is illustrates that most if not all router's come with default passwords.

59.The seven videos located at https://www.youtube.com/playlist?list=PLEAF7458098DA737F&feature=digest_mon are relevant in this case.

60.The seven videos located at https://www.youtube.com/playlist?list=PLEAF7458098DA737F&feature=digest_mon are admissible as evidence in this case.

61.The website of http://www.webopedia.com/ (and the computer science definitions that it provides) is relevant to this case.

62.The website of http://www.webopedia.com/ (and the computer science definitions that it provides) is relevant to this case.

63.The website of http://www.webopedia.com/ (and the computer science definitions that it provides) is admissible as evidence in this case.

64.The website of http://www.techzoom.net/tools/index.en (and the tools contained thereat) is relevant to this case.

65. The website of http://www.techzoom.net/tools/index.en (and tools contained thereat) is admissible as evidence in this case.

66. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 106, is accurate: "Like cable Internet access, DSL uses a device at the end-user premises that is commonly called a DSL *modem*, and as with cable access, it isn't a modem.  It's a network interface device that provides translation services between equipment at the end-user premises and the telephone line.  Exactly which services are provided by the DSL modem depends on the model.  For example, some act as routers, switches, and wireless access points, eliminating the need for some other pieces of network equipment for a very small network."

67. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 106, is accurate: "Like cable Internet access, DSL uses a device at the end-user premises that is commonly called a DSL *modem*, and as with cable access, it isn't a modem.  It's a network interface device that provides translation services between equipment at the end-user premises and the telephone line.  Exactly which services are provided by the DSL modem depends on the model.  For example, some act as

routers, switches, and wireless access points, eliminating the need for some other pieces of network equipment for a very small network."

68. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 106, is relevant to this case: "Like cable Internet access, DSL uses a device at the end-user premises that is commonly called a DSL *modem*, and as with cable access, it isn't a modem.  It's a network interface device that provides translation services between equipment at the end-user premises and the telephone line. Exactly which services are provided by the DSL modem depends on the model. For example, some act as routers, switches, and wireless access points, eliminating the need for some other pieces of network equipment for a very small network."

69. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 106, is admissible as evidence in this case: "Like cable Internet access, DSL uses a device at the end-user premises that is commonly called a DSL *modem*, and as with cable access, it isn't a modem.  It's a network interface device that provides translation services between equipment at the end-user premises and the telephone line.  Exactly which services are provided by the DSL modem depends on the model.  For example, some act as routers, switches, and wireless access points,

19

eliminating the need for some other pieces of network equipment for a very small network."

70. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 112-13, is accurate: "The router, which directs messages based on the software-assigned IP addresses rather than hardware-encoded MAC addresses, also provides a first-line security buffer for your internal network, handles assigning internal dynamic IP addresses, and directs traffic to the correct devices on the internal network. . . . IP addresses are software addresses. Although we've said that each device connected to the Internet must have a unique IP address, that doesn't mean that the IP address must be hard-wired to the device or that it must always be the same. IP addresses can be changed as needed, and because they are assigned either through a device's operating system or by a router, having them in software provides the necessary flexibility. Flexibility is particularly important because devices enter and leave a network frequently, as they start up, shut down, sleep, and wake up."

71. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 112-13, is authentic: "The router, which directs messages based on the software-

assigned IP addresses rather than hardware-encoded MAC addresses, also provides

a first-line security buffer for your internal network, handles assigning internal

dynamic IP addresses, and directs traffic to the correct devices on the internal

network. . . . IP addresses are software addresses.  Although we've said that each

device connected to the Internet must have a unique IP address, that doesn't mean

that the IP address must be hard-wired to the device or that it must always be the

same.  IP addresses can be changed as needed, and because they are assigned either

through a device's operating system or by a router, having them in software

provides the necessary flexibility.  Flexibility is particularly important because

devices enter and leave a network frequently, as they start up, shut down, sleep,

and wake up."

      72.The following statement taken from Jan L. Harrington's book,

"Ethernet Networking for the Small Office and professional Home Office, page

112-13, is relevant in this case: "The router, which directs messages based on the

software-assigned IP addresses rather than hardware-encoded MAC addresses, also

provides a first-line security buffer for your internal network, handles assigning

internal dynamic IP addresses, and directs traffic to the correct devices on the

internal network. . . . IP addresses are software addresses.  Although we've said

that each device connected to the Internet must have a unique IP address, that

doesn't mean that the IP address must be hard-wired to the device or that it must always be the same.  IP addresses can be changed as needed, and because they are assigned either through a device's operating system or by a router, having them in software provides the necessary flexibility.  Flexibility is particularly important because devices enter and leave a network frequently, as they start up, shut down, sleep, and wake up."

73.The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 112-13, is admissible as evidence in this case: "The router, which directs messages based on the software-assigned IP addresses rather than hardware-encoded MAC addresses, also provides a first-line security buffer for your internal network, handles assigning internal dynamic IP addresses, and directs traffic to the correct devices on the internal network. . . . IP addresses are software addresses.  Although we've said that each device connected to the Internet must have a unique IP address, that doesn't mean that the IP address must be hard-wired to the device or that it must always be the same.  IP addresses can be changed as needed, and because they are assigned either through a device's operating system or by a router, having them in software provides the necessary flexibility.  Flexibility is

22

particularly important because devices enter and leave a network frequently, as they start up, shut down, sleep, and wake up."

74. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 118, is accurate: "Ultimate responsibility for assigning IP numbers rests with the Internet Assigned Numbers Authority (IANA).  However, numbers are actually assigned by regional registries.  In the United States, for example, registration is handled by the American Registry for Internet Numbers (ARIN).  IP numbers are assigned in large blocks to ISPs."

75. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 118, is relevant to this case: "Ultimate responsibility for assigning IP numbers rests with the Internet Assigned Numbers Authority (IANA).  However, numbers are actually assigned by regional registries.  In the United States, for example, registration is handled by the American Registry for Internet Numbers (ARIN).  IP numbers are assigned in large blocks to ISPs."

76. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 118, is accurate: "Ultimate responsibility for assigning IP numbers rests with the

Internet Assigned Numbers Authority (IANA).  However, numbers are actually assigned by regional registries.  In the United States, for example, registration is handled by the American Registry for Internet Numbers (ARIN).  IP numbers are assigned in large blocks to ISPs."

77. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 118, is authentic: "Ultimate responsibility for assigning IP numbers rests with the Internet Assigned Numbers Authority (IANA).  However, numbers are actually assigned by regional registries.  In the United States, for example, registration is handled by the American Registry for Internet Numbers (ARIN).  IP numbers are assigned in large blocks to ISPs."

78. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 118, is admissible as evidence in this case: "Ultimate responsibility for assigning IP numbers rests with the Internet Assigned Numbers Authority (IANA). However, numbers are actually assigned by regional registries.  In the United States, for example, registration is handled by the American Registry for Internet Numbers (ARIN).  IP numbers are assigned in large blocks to ISPs."

79. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 122, is accurate: "Dynamic IP addresses are assigned to a device whenever the device connects to the network.  You [sic] router, for example, will be given an IP address by your ISP when the router connects to the ISP; workstations and printers will be given IP addresses by the router when they join the network.  The router's dynamic IP address will be taken from the ISP's block of IP addresses; internal devices will usually be given addresses from the non-routable block of internal addresses."

80. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 122, is relevant to this case: "Dynamic IP addresses are assigned to a device whenever the device connects to the network.  You [sic] router, for example, will be given an IP address by your ISP when the router connects to the ISP; workstations and printers will be given IP addresses by the router when they join the network.  The router's dynamic IP address will be taken from the ISP's block of IP addresses; internal devices will usually be given addresses from the non-routable block of internal addresses."

81. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 122, is admissible as evidence in this case: "Dynamic IP addresses are assigned to a device whenever the device connects to the network.  You [sic] router, for example, will be given an IP address by your ISP when the router connects to the ISP; workstations and printers will be given IP addresses by the router when they join the network.  The router's dynamic IP address will be taken from the ISP's block of IP addresses; internal devices will usually be given addresses from the non-routable block of internal addresses."

82. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 122, is authentic: "Dynamic IP addresses are assigned to a device whenever the device connects to the network.  You [sic] router, for example, will be given an IP address by your ISP when the router connects to the ISP; workstations and printers will be given IP addresses by the router when they join the network.  The router's dynamic IP address will be taken from the ISP's block of IP addresses; internal devices will usually be given addresses from the non-routable block of internal addresses."

83. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 122, is accurate: "There are two protocols in wide use for assigning dynamip IP addresses, DHCP (*Dynamic Host Configuration Protocol*) and BootP (*Bootstrap Protocol*).  These Network layer protocols typically give a device a new IP address when it connects to a network.  Both require 'servers' running the protocols to issue IP addresses.  However, for a small network, the servers are built in to [sic] most small routers; you don't need a standalone machine acting as a DCHP or BootP server."

84. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 122, is authentic: "There are two protocols in wide use for assigning dynamip IP addresses, DHCP (*Dynamic Host Configuration Protocol*) and BootP (*Bootstrap Protocol*).  These Network layer protocols typically give a device a new IP address when it connects to a network.  Both require 'servers' running the protocols to issue IP addresses.  However, for a small network, the servers are built in to [sic] most small routers; you don't need a standalone machine acting as a DCHP or BootP server."

85. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 122, is relevant in this case: "There are two protocols in wide use for assigning dynamip IP addresses, DHCP (*Dynamic Host Configuration Protocol*) and BootP (*Bootstrap Protocol*). These Network layer protocols typically give a device a new IP address when it connects to a network. Both require 'servers' running the protocols to issue IP addresses. However, for a small network, the servers are built in to [sic] most small routers; you don't need a standalone machine acting as a DCHP or BootP server."

86. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 122, is admissible as evidence in this case: "There are two protocols in wide use for assigning dynamip IP addresses, DHCP (*Dynamic Host Configuration Protocol*) and BootP (*Bootstrap Protocol*). These Network layer protocols typically give a device a new IP address when it connects to a network. Both require 'servers' running the protocols to issue IP addresses. However, for a small network, the servers are built in to [sic] most small routers; you don't need a standalone machine acting as a DCHP or BootP server."

87. The following statement taken from Jan L. Harrington's book,
"Ethernet Networking for the Small Office and professional Home Office, page
123, is accurate: "*Dynamic allocation*: A network administrator supplies a range of
IP addresses to DHCP.  DHCP then issues an unused IP address from this range to
a device each time the device connects to the network.  When the device
disconnects – usually when it powers down – the IP address is returned to the pool
of unused addresses to be assigned to anther device."

88. The following statement taken from Jan L. Harrington's book,
"Ethernet Networking for the Small Office and professional Home Office, page
123, is authentic: "*Dynamic allocation*: A network administrator supplies a range
of IP addresses to DHCP.  DHCP then issues an unused IP address from this range
to a device each time the device connects to the network.  When the device
disconnects – usually when it powers down – the IP address is returned to the pool
of unused addresses to be assigned to anther device."

89. The following statement taken from Jan L. Harrington's book,
"Ethernet Networking for the Small Office and professional Home Office, page
123, is relevant to this case: "*Dynamic allocation*: A network administrator
supplies a range of IP addresses to DHCP.  DHCP then issues an unused IP address
from this range to a device each time the device connects to the network.  When

the device disconnects – usually when it powers down – the IP address is returned to the pool of unused addresses to be assigned to anther device."

90. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 123, is admissible as evidence in this case: "*Dynamic allocation*: A network administrator supplies a range of IP addresses to DHCP. DHCP then issues an unused IP address from this range to a device each time the device connects to the network. When the device disconnects – usually when it powers down – the IP address is returned to the pool of unused addresses to be assigned to anther device."

91. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 128, is accurate: "How does a router know where to send a packet? Like a switch, it keeps an internal table that indicates the port out of which it should sent a packet with a given address. And like a switch, a router learns destinations, although unlike a switch, a router can exchange information with other routers; switches generally don't talk to one another."

92. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page

128, is authentic: "How does a router know where to send a packet?  Like a switch, it keeps an internal table that indicates the port out of which it should sent a packet with a given address.  And like a switch, a router learns destinations, although unlike a switch, a router can exchange information with other routers; switches generally don't talk to one another."

93. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 128, is relevant to this case: "How does a router know where to send a packet? Like a switch, it keeps an internal table that indicates the port out of which it should sent a packet with a given address.  And like a switch, a router learns destinations, although unlike a switch, a router can exchange information with other routers; switches generally don't talk to one another."

94. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 128, is admissible in this case: "How does a router know where to send a packet? Like a switch, it keeps an internal table that indicates the port out of which it should sent a packet with a given address.  And like a switch, a router learns destinations, although unlike a switch, a router can exchange information with other routers; switches generally don't talk to one another."

31

95. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 130, is accurate: The paragraph beginning with "Each IP address assigned to a network device" and ending with "What remains is the network portion."

96. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 130, is authentic: The paragraph beginning with "Each IP address assigned to a network device" and ending with "What remains is the network portion."

97. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 130, is relevant to this case: The paragraph beginning with "Each IP address assigned to a network device" and ending with "What remains is the network portion."

98. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 130, is admissible as evidence in this case: The paragraph beginning with "Each IP address assigned to a network device" and ending with "What remains is the network portion."

99. The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 130, is accurate: The paragraph beginning with "If you walk into an office" and ending with "a 'router' may be all that you need for the complete setup."

100.    The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 130, is authentic: The paragraph beginning with "If you walk into an office" and ending with "a 'router' may be all that you need for the complete setup."

101.    The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 130, is relevant to this case: The paragraph beginning with "If you walk into an office" and ending with "a 'router' may be all that you need for the complete setup."

102.    The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 130, is admissible as evidence in this case: The paragraph beginning with "If you walk into an office" and ending with "a 'router' may be all that you need for the complete setup."

103.    The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, pages 130-31, is accurate: The paragraph beginning with "*Note: Ironically, if you're using DSL*" and ending with "*to determine exactly what you will be getting!*"

104.    The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, pages 130-31, is authentic: The paragraph beginning with "*Note: Ironically, if you're using DSL*" and ending with "*to determine exactly what you will be getting!*"

105.    The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, pages 130-31, is relevant to this case: The paragraph beginning with "*Note: Ironically, if you're using DSL*" and ending with "*to determine exactly what you will be getting!*"

106.    The following statement taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, pages 130-31, is admissible as evidence in this case: The paragraph beginning with "*Note: Ironically, if you're using DSL*" and ending with "*to determine exactly what you will be getting!*"

107.    The following excerpts taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, pages 131-133, are accurate: The paragraph beginning on page 131 with "When you add a router to your network" and ending on page 133 with "You can find a table of them in Appendix B."

108.    The following excerpts taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, pages 131-133, are relevant to this case: The paragraph beginning on page 131 with "When you add a router to your network" and ending on page 133 with "You can find a table of them in Appendix B."

109.    The following excerpts taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, pages 131-133, are admissible as evidence in this case: The paragraph beginning on page 131 with "When you add a router to your network" and ending on page 133 with "You can find a table of them in Appendix B."

110.    The following excerpts taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, pages 131-133, are authentic: The paragraph beginning on page 131 with "When you add

a router to your network" and ending on page 133 with "You can find a table of them in Appendix B."

111.    The following excerpt taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 136, is accurate: "*Notes: yes, you've read correctly.  The router has two IP addresses, one to identify it as a destination to the internal network and another for its WAN port, which identifies it to the Internet.*"

112.    Table 7-1 taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 143, is authentic.

113.    Table 7-1 taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 143, is admissible as evidence in this case.

114.    The following excerpt taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 144, is accurate: Beginning with "Wireless access points are limited" and ending with "Aps have names known at Service Set Identifiers (SSID)s."

115.    The following excerpt taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page

144, is authentic: Beginning with "Wireless access points are limited" and ending with "Aps have names known at Service Set Identifiers (SSID)s."

116.    The following excerpt taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 144, is relevant to this case: Beginning with "Wireless access points are limited" and ending with "Aps have names known at Service Set Identifiers (SSID)s."

117.    The following excerpt taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 144, is admissible as evidence in this case: Beginning with "Wireless access points are limited" and ending with "Aps have names known at Service Set Identifiers (SSID)s."

118.    The following excerpt taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 145, is accurate: Beginning with "By default, Aps broadcast" and ending with "routers in in the United States broadcasting the SSID 'linksys.'

119.    The following excerpt taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 145, is authentic: Beginning with "By default, Aps broadcast" and ending with "routers in in the United States broadcasting the SSID 'linksys.'

120.     The following excerpt taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 145, is relevant to this case: Beginning with "By default, Aps broadcast" and ending with "routers in in the United States broadcasting the SSID 'linksys.'"

121.     The following excerpt taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 145, is admissible as evidence in this case: Beginning with "By default, Aps broadcast" and ending with "routers in in the United States broadcasting the SSID 'linksys.'"

122.     The following excerpt taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office, page 147, is admissible as evidence in this case: Beginning with "*Note: How big a problem*" and ending with "which is discussed in the last section of this chapter."

123.     The following excerpt taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office is authentic: Everything under the "Wireless Security Issues" heading beginning on page 148.

124.     The following excerpt taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office is

relevant to this case: Everything under the "Wireless Security Issues" heading beginning on page 148.

125.    The following excerpt taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office is admissible as evidence in this case: Everything under the "Wireless Security Issues" heading beginning on page 148.

126.    The following excerpt taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office is authentic: Everything under the "Authentication Vulnerabilities" heading beginning on page 206.

127.    The following excerpt taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office is relevant to this case: Everything under the "Authentication Vulnerabilities" heading beginning on page 206.

128.    The following excerpt taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office is admissible as evidence in this case: Everything under the "Authentication Vulnerabilities" heading beginning on page 206.

129.    The following excerpt taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office is authentic: Everything under the "Authentication Vulnerabilities" heading beginning on page 206.

130.    The following excerpt taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office is authentic: Everything under the "Firewalls" heading beginning on page 222.

131.    The following excerpt taken from Jan L. Harrington's book, "Ethernet Networking for the Small Office and professional Home Office is admissible as evidence in this case: Everything under the "Firewalls" heading beginning on page 222.

132.    The article(s) located at the following locations are (a) authentic; (b) relevant to this case; and (3) admissible as evidence in this case:[1]

    a.  http://www.csl.mtu.edu/cs6461/www/Reading/Saroiu02.pdf

    b.  http://ieeexplore.ieee.org/xpl/freeabs_all.jsp?reload=true&arnumber=5461962

---

[1] For the sake of brevity, this question is structured into sub-parts.  Please answer each sub-part as a separate request for admission as to the issue of authenticity, relevancy, and admissibility.

c. http://www.mendeley.com/research/deconstructing-the-kazaa-network/

d. http://www.pam2004.org/papers/148.pdf

e. http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/20120215-16/Testimony_15_Levine_2.pdf

f. http://www.mendeley.com/research/free-riding-in-bittorrent-is-cheap-3/

g. http://bittorrent.org/bittorrentecon.pdf

h. http://www.cs.washington.edu/homes/gribble/papers/mmcn.pdf

i. https://duckduckgo.com/l/?u=http%3A%2F%2Fciteseer.ist.psu.edu%2Fviewdoc%2Fdownload%3Fdoi%3D10.1.1.59.3191%26rep%3Drep1%26type%3Dpdf

j. https://duckduckgo.com/l/?u=http%3A%2F%2Fwww2.research.att.com%2F~jiawang%2Fpeernet-imw02.ppt

k. http://nmlab.korea.ac.kr/project/papers/Traffic_Classification/Analyzing%20Peer-to-Peer%20Traffic%20Across%20Large%20Networks.pdf

l. http://www.mendeley.com/research/rarestfirst-and-choke-algorithms-are-enough/

m. http://static.usenix.org/event/leet10/tech/full_papers/LeBlond.pdf

n.

133.     The entire book by "Harrington" listed above is relevant to this case.

134.     The bittorrent client "Vuze" has a different DHT network than the "mainline" network used by other bittorrent clients.

135.     The current version of the "uTorrent" bittorrent client has a feature that allows a peer to change the "port" used by packets of information being sent and received pursuant to the bittorrent protocol.

136.     One or more past versions of the "uTorrent" bittorrent client had a feature that allows a peer to change the "port" used by packets of information being sent and received pursuant to the bittorrent protocol.

137.     No past or present bittorrent "clients" such as Vuze or uTorrent have a feather that allows a user to keep a log of what "ports" the client used to transmit/receive information via the bittorrent protocol in the past.

138.     The "open tracker" software was the software used to operate any bittorrent "trackers" relevant to this case.

139.     Each peer (as identified by an IP address) connected to a "tracker" via the bittorrent protocol does not necessarily connect to any other peer at any point in time.

140.     There is no possible method for searching a bittorrent "swarm" for peers who are offering a particular audiovisual file.

141.     There is no possible method for searching a bittorrent "swarm" for peers who are offering a particular file.

142.     The technology referred to in the declaration of Matthias Schroeder in the Prior Lawsuit, used to supposedly detect the downloaders of a copyright work, involves the uploading of pieces of data to those "peers" (as identified by an IP address) in the bittorrent "swarm" as those terms are defined in the bittorrent vernacular.

143.     The technology referred to in the declaration of Matthias Schroeder in the Prior Lawsuit, used to supposedly detect the downloaders of a copyright work, involves the downloading of pieces of data from those "peers" (as identified by an IP address) in the bittorrent "swarm" as those terms are defined in the bittorrent vernacular.

144. The uploading of data as described in paragraph 142 above constitutes contributory infringement.

145. The downloading of data as described in paragraph 143 above constitutes contributory infringement.

146. The bittorrent clients Vuze and uTorrent contain a "peers" tab (or a similar menu option) of the supposed IP addresses of the "peers" that one is connected when utilizing the bittorrent protocol to download a file.

147. A dynamically assigned IP address to a router or a modem does not necessarily identify a particular computer.

148. A dynamically assigned IP address to a router or a modem does not necessarily identify a particular person using a particular computer.

149. Under District of Columbia law, personal jurisdiction does not exist over a person who has no contacts with the District other than allegedly being connected to another "peer" utilizing the bittorrent protocol that is located within the District at the time.

150. When the bittorrent protocol utilizes a "tracker," it randomly connects a peer connected to the tracker to one or more other peers, and a particular peer cannot choose to connect to any particular peer.

151.     When a computer connects to the Internet using a modem and/or a router serving as a network translation device (NAT), a computer's internal IP address is not visible once information passes through the NAT.

152.     When a person connects to the Internet using a modem or router that acts as a network translation device (NAT), any information transmitted or received by the NAT to the Internet would appear to be from the IP address assigned to the NAT by the ISP.

153.     It is possible for a neighbor or another person – within range – to access a person's wireless Internet account, in which case the activities of the person would be detected as being associated with the IP address assigned by the ISP to the router or modem serving as a network address translation device.

154.     The e-mails attached within Exhibit A are authentic.[2]

155.     Attached within Exhibit B is a true and authentic copy of an affidavit executed by Robin Mason.

---

[2] For the sake of brevity, the e-mails have been attached *en masse* within Exhibit A.  Therefore, this question should be construed as having sub-parts consisting of the same request for admission with respect to each e-mail record.  For example, a sufficient response might be "authenticity is admitted" with respect to every e-mail except the e-mail(s) dated XXXX and sent at YYYY time.  Another proper response might be: "E-mailed dated XXX and sent at YYY – admitted."  "E-mail dated RRRR and sent at UUUU – denied."

156.     Attached within Exhibit C is a true and authentic copy of an affidavit executed by Keith Popham.

157.     The affidavit attached as Exhibit B is relevant to this case with respect to proving copyright infringement (or a lack thereof) by Defendant.

158.     The affidavit attached as Exhibit B is admissible as evidence in this case with respect to proving liability or non-liability for copyright infringement by Defendant.

159.     The affidavit attached as Exhibit B is admissible in this case with respect to any legal issue other than proving liability or non-liability for copyright infringement by Defendant.

160.     The affidavit attached as Exhibit C is relevant to this case with respect to proving copyright infringement (or a lack thereof) by Defendant.

161.     The affidavit attached as Exhibit C is admissible as evidence in this case with respect to proving copyright infringement (or a lack thereof) by Defendant.

162.     The affidavit attached as Exhibit C is admissible as evidence in this case with respect to proving any legal issue other than copyright infringement by Defendant (or a lack thereof).

163.    The letter attached as Exhibit D is a true and authentic copy of a letter sent to Plaintiff's prior counsel.

164.    On a computer using the windows operating system, if data is deleted using the "Recycle Bin" feature, it is possible for it to be overwritten partially or in full as a computer is used.

165.    On the same hypothetical computer stated in paragraph 164, the longer that a computer is used the more likely it is that the data would be overwritten.

166.    On the same hypothetical computer stated in paragraph 164, the mere deletion of data using the "Recycle Bin" feature does not mean that the data is unrecoverable or undetectable through:

      a.  A "forensic examination" as that phrase is used in the computer science field; or

      b.  A program called "Recuva;"

167.    The program named Recuva is accepted by the mainstream of computer users as one of the best data recovery programs on the market that is free.

168.    The program named "Recuva" is commonly accepted in the computer science field as a reliable way of detecting the existence (or non-existence) of certain data on a computer that was supposedly deleted or erased.

169.    Computers are essential to many people's personal and professional lives.

170.    Computers sometimes get viruses that disrupt their proper functioning, delete data without permission.

171.    Computers sometimes get viruses that disrupt the proper functioning of the computer to such an extent that formatting a computer's hard drive and reinstalling the operating system is necessary.

172.    Computers sometimes get viruses that disrupt the proper functioning of the computer to such an extent that it is necessary to uninstall a trouble-causing program or delete trouble-causing data.


Respectfully submitted March 22, 2012:


1600 Alexandria Court                    BLAIR CHINTELLA
Marietta, GA 30067
404-579-9668                             _____
No Fax Number                            Georgia Bar No. 510109
bchintel1@gmail.com                      Attorney for Defendant

48